Filed 3/12/26  P. v. Pantoja CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G063470 |
| v. | (Super. Ct. No. 21HF0805) |
| PEDRO PANTOJA, JR., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge. Sentence vacated in part and remanded for further proceedings; affirmed in all other respects.

Law Offices of Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa

Mandel and James Spradley, Deputy Attorneys General, for Plaintiff and Respondent.

*      *      *

Defendant Pedro Pantoja, Jr. appeals after a jury convicted him of murder and other charges and the trial court sentenced him to more than 30 years to life in prison. He contends the court improperly precluded his counsel from cross-examining a witness about information that may have demonstrated bias and the prosecutor committed misconduct during closing argument. In addition, he argues the sentencing minute order and abstract of judgment must be corrected to align with the court's oral pronouncements concerning fines and fees. Although we conclude the prosecutor erred in one respect, Pantoja fails to demonstrate prejudice, and we find no merit in his other trial-related arguments. However, because we agree the sentencing minute order and indeterminate abstract of judgment include mandatory ancillary costs not imposed by the court at sentencing, and because defendant was not previously provided an opportunity to demonstrate an inability to pay them (see *People v. Kopp* (2025) 19 Cal.5th 1, 30 (*Kopp*)), we remand for a limited resentencing to allow the trial court to determine whether to impose the ancillary costs and if, so, their amounts. We otherwise affirm the judgment.

FACTS

Following a head-on crash between two vehicles, which killed one person and injured another, an amended information charged Pantoja with murder (Pen. Code, § 187, subd. (a)), driving under the influence of drugs causing bodily injury with one prior (Veh. Code, § 23153, subd. (f)), unlawful taking of a vehicle (Veh. Code, § 10851, subd. (a)), driving on a suspended or revoked license with a prior (Veh. Code, § 14601.2, subd. (a)), and possession

of controlled substance paraphernalia (Health & Saf. Code, § 11364, subd. (a)). It further alleged that as to the driving under the influence charge, Pantoja personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)), and he was previously convicted of a serious and violent felony that qualified as a strike (Pen. Code., §§ 667, subds. (d), (e)(1), 1170.12, subd. (b), (c)(1)).

Evidence presented to a jury at trial revealed what transpired in the hours leading to the crash. Around 1:00 a.m., in the parking lot of a gambling establishment, a man wearing all black, a hat, and a face mask walked up to a parked vehicle which was not his. The man, later identified as Pantoja, opened the driver's side door of the vehicle and drove off.

About four hours later, an employee at a fast food restaurant in the City of Tustin saw the stolen vehicle in the restaurant's drive-thru lane. When the manager arrived around 8:00 a.m., he told the manager about the vehicle. The manager spoke to Pantoja, who was in the driver's seat, telling him the restaurant did not open for another couple of hours and he needed to move out of the drive-thru lane. Pantoja responded with some sounds, but the manager could not understand what he said. The manager said he looked "very tired," with his eyes bloodshot, "kind of watery," and barely open. Having seen Pantoja "coming in and out of consciousness," the employee who first observed the vehicle called 9-1-1. As the manager continued with other tasks, he glanced from time-to-time at the drive-thru lane. He observed Pantoja's head "slump back in the seat, and then he would sit up again," making "jittery movements."

Roughly 20 minutes after the manager spoke to Pantoja, the vehicle moved to an adjacent parking lot area. Pantoja exited the vehicle, opened the trunk, then got back in through the driver's side door. Although

3

neither the manager nor the employee saw any other person in the vehicle, video surveillance captured a female, later identified as L.W., sitting in the front passenger seat with her head reclined as if she was asleep.

Shortly after Pantoja reentered the parked vehicle, at around 9:00 a.m., a police officer arrived and parked behind him. When the vehicle "backed up a little bit and took off," the police officer followed.

Pantoja drove through the back alley of the shopping center, went the wrong way through a gas station, ran a stop sign and a red light, crossed two sets of double yellow lines, and proceeded in the wrong direction past a "'do not enter sign'" onto the off-ramp of a major street. Driving between 55 and 60 miles per hour, Pantoja nearly collided with seven vehicles traveling in the opposite direction before colliding head on with another vehicle. The sole occupant of the other vehicle, David Kawashima, was killed.

Video footage captured of the aftermath of the crash did not show anyone exit or enter the vehicle occupied by Pantoja and L.W. before additional law enforcement arrived. When officers approached the vehicle, they found Pantoja and L.W. inside. Pantoja was in the left rear passenger seat and L.W. was in the front passenger seat which was partially reclined. A later search of the vehicle revealed a glass pipe with white residue, which was consistent in appearance with methamphetamine, in the center console, as well as a torch lighter.

L.W. and Pantoja were both taken to the hospital. L.W., who was 20 weeks pregnant, had three broken ribs, a chest injury, and "free fluid in her abdomen, . . . consistent with blunt abdominal trauma." Because she appeared to be under the influence, a doctor administered her a dose of Narcan. When interviewed the next day, L.W. confirmed Pantoja was driving the vehicle at the time of the crash.

Pantoja sustained a fractured forearm and ankle, as well as a large laceration on the front of his right leg. The treating doctor believed he was also under the influence, but he did not appear to need a dose of Narcan. An investigator who evaluated him opined he was under the influence of a stimulant. During the evaluation, Pantoja told the investigator he smoked methamphetamine the night before "and that he smokes it if he has it." When interviewed the next day, he confirmed the vehicle he was driving was not his, he said he could not remember where he got it, and he denied having any memory of the crash. Pantoja confirmed L.W. had been in the front passenger seat, but did not claim there were more than two people in the vehicle at the time of the crash or that someone else was driving.

DNA collected from the driver's airbag of the vehicle contained a profile consistent with Pantoja's as the only major contributor. A forensic scientist testified that "one in one trillion unrelated individuals [would be] expected to have that same DNA profile." Blood samples taken from Pantoja in the morning and afternoon on the day of the crash showed the presence of methamphetamine and amphetamine.

L.W. testified as a prosecution witness at trial, conveying in response to questioning that she did not want to testify and she did not want Pantoja to get in trouble. She confirmed multiple times she was not driving the vehicle on the day of the crash and said she was not aware of anyone else being in the vehicle. Although L.W. initially testified she could not remember who was driving the vehicle, and later testified she was "not positive whether [Pantoja] was driving or not during the accident" because she was asleep during it, she ultimately said she remembered telling law enforcement that she woke up when Pantoja was driving on the wrong side of the road. When

5

questioned about a voicemail message of someone claiming to be her taking responsibility for the crash, she testified it was not her voice.

The jury found Pantoja guilty on all counts and found true the great bodily injury and prior conviction allegations. After finding true the strike prior allegation, the trial court sentenced him to 30 years to life, plus eight years and four months in prison.

Pantoja timely appealed.

DISCUSSION

Pantoja raises three separate challenges on appeal. First, he contends the trial court erred in declining to allow his trial counsel to pursue a certain line of questioning when cross-examining L.W. Second, he argues the prosecutor committed misconduct during closing argument. Third, he states the abstract of judgment must be corrected to be consistent with the trial court's oral pronouncement of judgment concerning fines and fees. We find one harmless error in the prosecutor's closing argument, and determine the matter must be remanded to the trial court for limited further proceedings concerning ancillary costs, but otherwise find no merit in Pantoja's contentions.

I.

QUESTIONING WITNESS ABOUT POTENTIAL LENIENCY IN UNRELATED CASE

During in limine proceedings, the trial court ruled it would not allow defense counsel to question L.W. about any potential leniency she expected to receive in an unrelated, separately pending case against her based on her testimony in the case against Pantoja. Pantoja argues the court violated his federal Sixth Amendment right of confrontation by doing so. We disagree.

6

*A. Additional Relevant Facts*

During a hearing concerning the parties' motions in limine, defense counsel indicated a desire to question L.W. about past convictions, an existing probation resulting from an Orange County conviction, and a pending probation violation related to the latter. Though defense counsel acknowledged they were "not aware of any formal offer from the District Attorney for leniency or consideration in exchange for testimony," counsel felt her subjective state of mind regarding those matters was relevant. In response, the prosecutor, as "an officer of the court," represented "there ha[d] been no offer of any type of immunity or any type of anything in exchange for her testimony."

The trial court indicated the convictions and existence of probation were fair grounds for questioning, but inquired further of defense counsel regarding the contemplated leniency or consideration line of questioning:

"The Court: What question specifically do you want to ask her?

"[Defense Counsel]: I think the fact that she has a probation violation. She has an upcoming court date to deal with that violation and whether or not she believes—the ultimate question is—or the argument would be, 'do you believe you are getting a benefit by testifying to that?'

"[Prosecutor]: I think that that's a slippery slope and highly speculative. [¶] I don't see the relevance in asking her that. [¶] . . . [¶] I believe it's somewhat attenuated to, you know—and I don't think—

"The Court: I think it's attenuated, too. But let me think about it until the morning and I will make my ruling on it."

The following morning, the court once again asked defense counsel about the specific desired questioning. Defense counsel reiterated

7

they had "not heard that any offer ha[d] been made, any suggestion that if [L.W.] testifies, she will be compensated," but said they believed it was "a fair question to ask her even if subjectively she thinks, 'Well, if I can testify, maybe down the road, I can use this to curry some favor.'"

Ultimately, the court determined it would not allow inquiry into L.W.'s subjective belief. Instead, it would limit inquiry to the past convictions, the placement on probation, the fact of an arrest on a probation violation, the subsequent release, and contact made with L.W. by a district attorney investigator, including how the investigator got information and tracked down L.W. After the court stated as much, the prosecutor clarified for the record, "There is no formal or informal or wink-and-a-nod or any type of agreement in any way, shape or form with [L.W.]"

*B. Analysis*

"As a general matter, a defendant is entitled to explore whether a witness has been offered any inducements or expects any benefits for his or her testimony, as such evidence is suggestive of bias." (*People v. Brown* (2003) 31 Cal.4th 518, 544; see also Evid. Code, § 780, subd. (f).) "[H]owever, [a defendant's] right to cross-examination is not a matter of 'absolute right.' Although [our high court] ha[s] said that '[c]ross-examination to test the credibility of a prosecuting witness in a criminal case should be given wide latitude' [citation], such latitude does not 'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance.'" (*Brown*, at p. 545.) "[U]nless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard

8

does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal.4th 894, 946 (*Frye*).)

We begin by noting that none of the cases cited by Pantoja or the Attorney General are directly on point. *Delaware v. Van Arsdall* (1986) 475 U.S. 673 (*Van Arsdall*), cited by Pantoja, concluded it was error for the trial court to preclude defense counsel from asking a witness any questions about the past dismissal of an unrelated criminal charge against him. (*Id.* at p. 679.) The dismissal took place after the witness agreed to speak with the prosecutor about the pending murder case, and during a hearing outside the presence of the jury, the witness admitted some type of agreement existed. (*Id.* at p. 676.) *People v. Dyer* (1988) 45 Cal.3d 26 (*Dyer*) and *People v. Bento* (1998) 65 Cal.App.4th 179, both cited by the Attorney General, also involved desired inquiries into past resolution of unrelated cases, such as a plea to a lesser included offense or a dismissal of charges. In both cases, the reviewing court concluded the trial court did not err in preventing the questioning because there was no indication the witnesses received leniency or some other benefit—in *Dyer*, the witnesses expressly said during a hearing outside the presence of the jury that they did not. (*Dyer*, at p. 48; *Bento*, at p. 195.)

Here, L.W. had a pending, not resolved, unrelated probation violation, and defense counsel wanted to inquire about her subjective belief of leniency in that case based on testimony given in this case. While there may be some situations in which such a line of inquiry is relevant, other circumstances in this case provided justification for the trial court's exercise of its gatekeeping authority to preclude it. Defense counsel represented more than once that they were unaware of any leniency or benefit discussion or offer. In addition, the prosecutor averred multiple times that there was none and explained all the circumstances of contact with L.W. This situation is

9

more like that considered in *Dyer* and *Bento*, than that at issue in *Van Arsdall*. Without any indication or offer of proof that there had been a discussion, an offer, or some other act related to potential leniency or benefit in the unrelated case, the trial court did not err in preventing defense counsel from cross-examining L.W. about her subjective belief.

In any event, Pantoja fails to show how the excluded cross-examination might reasonably have produced a significantly different impression of L.W.'s credibility. (*Frye, supra*, 18 Cal.4th at p. 946.) Although L.W. was called by the prosecution, she was not a cooperative witness. She claimed to not remember most things even when confronted with her prior statements, and she was impeached by both the prosecution and the defense. Pantoja has not demonstrated a Sixth Amendment violation.

## II.

### PROSECUTORIAL MISCONDUCT

Pantoja contends the prosecutor committed misconduct through various aspects of their closing argument and the misconduct amounts to a violation of his constitutional right to a fair trial. We consider each challenged aspect in turn and conclude there is no reversible error.

*A. Applicable Law, Generally*

"'"A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct."' [Citations.] '"A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible

10

methods employed to persuade the trier of fact."'"[1] (*People v. Parker* (2022) 13 Cal.5th 1, 71–72 (*Parker*).) The former amounts to a federal constitutional violation and the latter is a state law violation. (See *People v. Young* (2019) 7 Cal.5th 905, 932 (*Young*).)

When it comes to closing argument, "the prosecution is given wide latitude to make "'fair comment on the evidence, including reasonable inferences or deductions to be drawn from it.'"'" (*Parker, supra*, 13 Cal.5th at p. 72.) In contrast, "counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]." (*People v. Collins* (2010) 49 Cal.4th 175, 209.) "It is also misconduct for the prosecutor at the guilt phase of a criminal trial to 'appeal to the jury to view the crime through the eyes of the victim.'" (*Young, supra*, 7 Cal.5th at p. 933.)

"'"A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct."'"" (*Young, supra*, 7 Cal.5th at pp. 932–933.)

B. *"Mount Everest of evidence"*

In discussing the reasonable doubt standard, the prosecutor provided the jury with what the prosecutor considered to be the "meat" of the reasonable doubt instruction, noting there was "more to the instruction." The prosecutor then elaborated on the reasonable doubt concept, arguing: "Reasonable doubt is a standard that we utilize with every criminal case, every criminal trial in every courthouse. It's either proven beyond a

---

[1] "[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

reasonable doubt or it's not. [¶] It is not proof beyond all doubt. Even in a case like this where there's literally the Mount Everest of evidence, I don't have to prove it beyond all doubt. Even if you agree there's zero question the defendant committed this crime, I have to prove it beyond a reasonable doubt."

Pantoja contends the reference to a "Mount Everest of evidence" "conveyed to the jury [it] could find [him] guilty based on the amount of evidence and not whether the evidence proved [him] guilty beyond [a] reasonable doubt." In the same vein, he argues "it gave a misleading impression . . . that quantity of evidence was a determining factor." We disagree.

The prosecutor accurately stated the law when explaining that proof beyond a reasonable doubt does not mean proof beyond all doubt. (See CALCRIM No. 220 ["the evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt"]; *People v. Pierce* (2009) 172 Cal.App.4th 567, 572–573 [CALCRIM No. 220 correctly states law].) Additionally, and consistent with an instruction given to the jury before closing arguments, the prosecutor correctly identified that the burden to prove Pantoja committed the crimes fell on the prosecution. (See Pen. Code, § 1096; *People v. Centeno* (2014) 60 Cal.4th 659, 673 (*Centeno*).)

The circumstances before us are meaningfully different than those which led courts to find prosecutorial misconduct in the two cases Pantoja relies upon. In *Centeno*, the prosecutor displayed a projected geographical outline of the State of California and asked the jury to "consider a hypothetical criminal trial" in which the issue was "'[w]hat state is this?'" (*Centeno, supra,* 60 Cal.4th at p. 664.) The Supreme Court concluded the use

12

of such an iconic image, unrelated to the facts of the case, improperly "dr[e]w on the jurors' own knowledge rather than evidence presented at trial" and "essentially turn[ed] [the deliberation process] into a game that encourage[d] the jurors to guess or jump to a conclusion." (*Id.* at p. 669.) And in *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, the prosecutor used a digital jigsaw puzzle image "in which six different puzzle pieces of a picture c[a]me onto the screen sequentially," leaving two open spaces, with "[t]he picture [being] immediately and easily recognizable as the Statue of Liberty." (*Id.* at p. 1264.) The appellate court identified two concerns: (1) because "most jurors would recognize the image well before the initial six pieces [were] in place," the prosecutor's argument left "the distinct impression that the reasonable doubt standard may be met by a few pieces of evidence" and that the jurors could "jump to a conclusion"; and (2) after the six out of eight puzzle pieces were in place, "the prosecutor told the jury, 'this picture is beyond a reasonable doubt,' inappropriately suggesting a specific quantitative measure of reasonable doubt, i.e., 75 percent." (*Id.* at pp. 1267–1268.)

Here, the prosecutor's argument did not encourage jurors to jump to a conclusion or imply the beyond a reasonable doubt standard was a quantitative measure. Instead, viewing the argument in context as we must (*Centeno, supra*, 60 Cal.4th at p. 667), the prosecutor's reference to Mount Everest was a permissible fair comment on the large amount of evidence the prosecutor believed pointed to defendant's guilt, which included video recordings, DNA evidence, and a positive methamphetamine test. (See *People v. Cook* (2006) 39 Cal.4th 566, 608 ["A prosecutor may make fair comment on the state of the evidence"].)

13

*C. "Why did he deserve this?"*

During opening argument, the prosecutor discussed Kawashima's injuries. Linking the argument to the testimony of Dr. Ellis, the prosecutor said "[w]hat Mr. Kawashima went through was nothing short of a nightmare." The prosecutor then elaborated: "He was broken in every way, shape possible. And fingers may be pointed or attempted to be pointed in other directions. And they basically get up here and tell all of you—look at all of you and say, 'don't trust your lying eyes'—the only reason Mr. Kawashima was killed is because of the defendant. [¶] Fractures to his skull, fractures to his ribs, broken back, lacerated liver, lacerated heart—why? Why did he deserve this?" Defense counsel objected "to the last comment." The trial court overruled the objection saying it was "just argument," and the prosecutor continued, "Because he didn't."

It is well-established that ""an appeal for sympathy for the victim is out of place during an objective determination of guilt."" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 (*Seumanu*).) Pantoja asserts the prosecutor's argument impermissibly "appeal[ed] to the sympathy or passions of the jury." Although we agree with the Attorney General that the discussion of the doctor's testimony and Kawashima's injuries was proper, we agree with Pantoja that the prosecutor crossed the line with the rhetorical question to the jury about Kawashima deserving what he went through, as well as the prosecutor's own answer to the question stated after the overruling of the objection.

"There is, in any event, no reasonable probability that the prosecutor's fleeting remark had any effect on the jury, particularly given the overwhelming evidence of [Pantoja]'s guilt." (*Young, supra,* 7 Cal.5th at p. 933; see also *Seumanu, supra,* 61 Cal.4th at p. 1344 ["prosecutor's misconduct

14

in making a few remarks in a much longer closing argument, and an even longer trial, could not have prejudiced defendant, especially given the strong evidence of his guilt"].) The scope of Kawashima's injuries was part of the evidence presented to the jury, and DNA, videos, and witness testimony all placed Pantoja behind the wheel of the vehicle.

## D. Lack of Evidence to Support Defense Theory

During rebuttal argument, the prosecutor commented on the defense theory of the case, namely that Pantoja was not driving at the time of the crash. Noting that defense counsel showed the jury the video of the crash, the prosecutor argued: "Why didn't he show you the video of his client getting into the front seat and driving the car away? [¶] Why didn't counsel explain how miraculously during this high speed pursuit he went from the driver's seat and allegedly—miraculously for him—got in the back seat during this high speed pursuit? Where was all that evidence? [¶] Did you hear any of it? I'm not sure if I missed it. [¶] Because guess what—you can ask madam court reporter to read back the entirety of this trial and won't hear any evidence that someone else other than the defendant got in the driver's seat. [¶] Do you want to know why? Because there isn't any. [¶] . . . [¶] . . . [D]id he have any explanation for his client getting behind the wheel? Remember? He insinuated that this video was doctored when the witness was on the stand. [¶] Do you remember that? [¶] It doesn't hold a lot of water now, does it? When there's nothing to prove it. [¶] The original is right next to the zoomed in. [¶] Where were all of the explanations? He talks about the laws of physics. Where is his explanation for the laws of physics ceasing to exist in that car whereby his client somehow gets out of the driver's seat? [¶] Where is all that evidence?"

15

Pantoja contends the prosecutor's argument shifted the burden of proof by conveying to the jury his failure to present the specified evidence demonstrated his guilt. We are not persuaded.

"Comments on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible. [Citation.] However, a prosecutor may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.'" (*People v. Woods* (2006) 146 Cal.App.4th 106, 112.) As our high court summarized, "[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340.) The prosecutor's comments in this case fall into the former category. As the trial court aptly stated, the prosecutor made a fair comment about the evidence presented, or absence thereof. The circumstances are fundamentally different than the case relied on by Pantoja, in which the prosecutor argued defense counsel was "'obligated to put the evidence on from th[e] witness stand.'" (*Woods*, at p. 112.)

*E. "Nasally and almost whiny" Tone*

During the defense's closing argument, defense counsel argued that to find a conscious disregard of human life, the jury had to find Pantoja "forfeit[ed] [his] life." That is, he decided, "'I am ready to die. And I don't care how many people I take with me.'" Defense counsel contended no evidence suggested Pantoja forfeited his life, not even his statement to officers that he "'killed somebody.'"

In rebuttal, the prosecutor argued: "All of the things and buzz words that he was trying to pour into your ears—when you look at the elements of this crime, none of them are required. All that nonsense about forfeiting his life—not an element of this crime. 'He was fighting—he wanted to live. He is such an honest guy, he told his girlfriend, "tell my son the truth."'" Defense counsel objected, and the trial court overruled the objection. After argument finished, and outside the presence of the jury, defense counsel elaborated on the reason for the objection: "It's not so much the rebuttal argument. It was, I guess, the—I guess the voice or tone that the government took that made it sound like—if I could describe it for the record—a nasally—almost a whiny kind of tone. And again, I just want to put that on the record. I believe it goes beyond the argument of what the argument was and counter-argument and into almost a personal attack." The trial court responded, "I guess I must have missed that," but also noted it "didn't see any personal animosity at all during [the] trial or personal attacks."

Because the trial court is in the best position to assess tone of voice, we defer to its determination when there is nothing in the record suggesting the contrary. Here, the court did not recall hearing the nasally and whiny tone mentioned by defense counsel, and it specifically stated it did not observe any animosity or personal attacks at any point during the trial. Further, the prosecutor explained any perceived inflection in tone was not meant to be demeaning or rude; the prosecutor was simply trying to argue that defense counsel was attempting to change the elements of the crime. Pantoja has not demonstrated prosecutorial misconduct.

## III.

### FINES AND FEES

Regarding fines and fees, the sentencing hearing transcript shows the trial court only imposed restitution and parole revocation fines, both in the amount of $500. The court purported to waive all fees and other fines without providing an explanation. Yet, the minute order and the indeterminate abstract of judgment indicate an imposed $200 court security fee pursuant to Penal Code section 1465.8, as well as a $150 criminal conviction assessment pursuant to Government Code section 70373.

Because of the discrepancy between the court's oral pronouncement, on one hand, and the minutes and abstract, on the other, Pantoja's initial briefing on appeal argued the latter should be corrected to be consistent with the oral pronouncement (i.e. eliminate the fees). The Attorney General's original briefing agreed the "clerical mistake" in the minutes and abstract should be corrected by this court without the need for further proceedings. Notwithstanding that concession, this court requested further briefing from the parties concerning the impact of the Supreme Court's recent decision in *Kopp*, on the fee related issues, including (1) whether the trial court erred in failing to impose the court security fee and criminal conviction assessment, and (2) whether remand to the trial court is appropriate to allow defendant the opportunity to request the court waive those fees due to an inability to pay.

*Kopp* explained that the Penal Code section 1465.8 court security fee and the Government Code section 70373 criminal conviction assessment are properly characterized as ancillary costs. (*Kopp, supra*, 19 Cal.5th at pp. 14–15.) That is, they are funding mechanisms created by the Legislature to raise funds for court operations and facilities; they are not punitive in nature.

18

(*Id.* at pp. 11,26.) Our high court also reaffirmed that imposition of these ancillary costs is mandatory "for every criminal conviction except parking offenses." (*Id.* at p. 26.) However, due to a robust fee waiver system in civil cases for the same types of ancillary costs, the court determined the unavailability of a fee waiver in criminal cases violated equal protection guarantees. (*Id.* at pp. 26-27.) Accordingly, it concluded that upon request by a criminal defendant, a trial court must "consider a defendant's inability to pay before imposing a court operations assessment under Penal Code section 1465.8, subdivision (a)(1) or a court facilities assessment under Government Code section 70373, subdivision (a)(1)." (*Id.* at p. 30.) This includes "allow[ing] the parties to present and contest any relevant evidence or argument on th[e] question." (*Ibid.*)

Here, the trial court erred by not imposing the identified ancillary costs. At the same time, Pantoja was never provided the opportunity to request a waiver of some or all of those costs due to an inability to pay.[2] Accordingly, we remand the matter for further proceedings, in accordance with *Kopp,* concerning the ancillary costs omitted from the trial court's oral pronouncements. This will provide an opportunity for Pantoja to present evidence and argument concerning his ability to pay such costs.

## DISPOSITION

The matter is remanded for limited resentencing proceedings consistent with *Kopp* concerning the imposition of mandatory ancillary costs

---

[2] Pantoja's supplemental briefing states "[t]he record does not support a finding appellant had the ability to pay" the ancillary costs, citing some statements included in an addendum to a probation report considered by the trial court at sentencing. But, Pantoja's ability to pay fines or fees was never raised below. Rather, Pantoja's sentencing brief purely concerned the custodial aspect of his sentence.

under Penal Code section 1465.8 and Government Code section 70373, both of which were omitted from the trial court's original oral sentencing pronouncements. The judgment is affirmed in all other respects.



                                        DELANEY, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.